# EXHIBIT A

# COMPLAINT

IN THE

COURT OF COMMON PLEAS

CLEARFIELD, PENNSYLVANIA

**January 13, 2020**

MARGARET M. JAGER and,   )

ROBERT W. JAGER   )

(1181 Pleasant Valley Road

Woodland, PA 16881)

      Plaintiffs

vs.

DEPARTMENT OF ENVIRONMENTAL   )

PROTECTION

(Southwest Office of Chief Counsel

400 Waterfront Ave., Pittsburgh, PA15222)

      Defendants   )

2020-72-CP

I hereby certify this to be a true and attested copy of the original COMPLAINT statement filed in this case.

JAN 13 2020

A TRUE COPY
ATTEST: _____
PROTHONOTARY-CLERK

Request a TRIAL BY JURY

---

This is a Complaint against the DEP of PA who have been harassing us for the past 5 years, ignoring our fifth and 14th due process rights, making false and perjurious statements, colluding with the Indiana bank to deprive us of our home, etc., when we are not committing any crime. They have committed willful and malicious prosecution that has caused us substantial economic damage as well as humiliation, mental anguish, emotional distress and severe degeneration of our health, all of this without our ever having an evidentiary Hearing or due process in Court, only a penalty hearing after the Hearing was held before Judge Ledbetter without us.

1

The DEP has interfered with our bank in trying to cause problems to prevent us from continuing our horse-boarding enterprise. We recently went through a chapter 11 which was dismissed because the DEP was there at every step to throw a monkey wrench in and prevent us from moving forward. Now we were told by the bank's attorney that if we brought him $150,000. we could have our farm back. We found someone who would do that, but by then the attorney said he wanted $200,000. However, now that we have an investor who will pay the requested amount and allow us to get our farm back, the DEP has interfered again and told them that we must get off the farm and remove our horses before they will sell the farm to our investor. Also we just found out they have placed a *lis pendens* on the farm without our ever getting served with papers. They have turned our lives into a nightmare of major proportions.

## **BACKGROUND**

1. Margaret M. Jager (formerly Verhagen), purchased the farm on Pleasant Valley Road at the end of January 2012. There were manure piles all over the farm and one huge one at the top of the driveway, which now has two others added. At no time did anyone mention that there was any problem or potential problem with the manure. In any case we assumed it would be grandfathered because this has been an operating farm for over a hundred years.

2. Our original reason for purchasing the farm was to provide a safe place for troubled veterans returning from war. Approximately 22 veterans commit suicide every day, and Robert, being a Korean War Veteran, felt very strongly that horse therapy would be extremely beneficial to those soldiers who are caught up in the drama of war and would help to save lives. He opened a 501 c 3 (*Horse Therapy 4 Troubled Vets, Inc.*) but unfortunately we were unable to proceed because of the DEP.

3. We rented out the small house and the farmhouse and part of the barn, and at that time, Shelley, the former owner, stayed on at the barn because she had horses there. She was not happy that the farm was sold and we felt if she still had a presence there that it would help her not to be too upset. Since she was removing the manure and taking care of things we were not charging her for stalls. There was no other manure being put by the barn, other than the huge one that was already there, as Shelley had a tractor and would remove any manure up to the field, with the other barn tenants, who were specifically told to.

4. Robert was diagnosed with stage 4 cancer and had to be in LI with access to the VA hospital and his doctor to have it treated, so we were unable to make the 700-mile trip every week as we had planned. We were originally going to move into the farmhouse but this diagnosis curtailed that as a possibility immediately, so we rented out the house again. This tenant was not paying on time and we told him he had to leave. He begged us to allow him to stay until he found a place and he would catch up with the payments. He stayed a year, still owing us thousands of dollars and did not return our key until another year had passed. We rented it out and the new tenants were the ones who told us of all the problems, that the former tenant had trashed the house and grounds, all the copper piping had been stolen, pipes had to be replaced, so we could not rent it out. Presently we are in the process of putting it back together. At the end of October we have finally filed a lawsuit in the Court of Common Pleas for $65,100.00 against the tenant who did this to the farmhouse.

5. Robert and I came up to check on everything and found a disaster. There were large piles of manure on each side of the barn. Shelley had sold her tractor and no longer was bringing the manure up to the back field as she had been doing all along but making a pile in the yard, without ever letting us know. At that time she had 14 horses renting there. Also, the other tenants had ignored us and just piled the manure outside the barn door on the other side.

6. During this time one of my daughters unexpectedly died from cancer. My boss moved his business to Florida and I was out of a job. I have been unable to find one since then. I was also hospitalized, which piled up more money in unpaid bills.

7. On Robert's birthday in 2015, we were hit from behind by someone who was talking on his cellphone and our car was totaled. Since NY is a no-fault state we could collect very little and could not get the car replaced. We also have hospital bills from that and a variety of ailments that we suffered.

8. During April of 2015, in the middle of all our personal chaos, we were contacted by the PA DEP who told us we had to move the manure. We told them that we had to get machinery and a truck ready and it would take time. We touched on our personal problems that would make it more difficult, but there was no compassion and we were not allowed any leniency. Robert set about having a John Deere tractor overhauled so he could use the bucket. He took a $10,000. loan on it, which we have since paid off. Also he had to have a truck fixed, some of which he had to do himself because of lack of funds, which took approximately 4 months to get the truck ready to take up to Woodland. **Robert had to give up his job driving because the <u>manure problem became our NO 1 priority</u>. Now we both had no jobs and no money coming in,** except for our SS and sporadic payments from our remaining tenant, who was to go on owing us a ton of money. This was the beginning of our inability to pay our mortgage.

3

9. We were being inundated with mail, phone calls, letters, certified mail, in-person visits from the DEP harassing us to comply immediately with their requests. We tried to explain that we were two old people who were working as hard as we could, and as fast as we could, to do the best we could to comply. Robert had to be back and forth between here and the VA so he could have his checkups and treatment, which was a lot of wear and tear on our transportation. Also the equipment frequently broke down and parts were hard to get; the weather was a big problem and now the DEP took us to court because they did not feel as if we were moving fast enough. This is the Hearing that we were never notified about and they went and did whatever they did without our being present, denying us our due process rights.

10. Our attention was diverted and we had to take time out to read, absorb and try to understand and answer the incessant barrage of letters and Court records, so there was less time to work on the manure problem. In the meantime we were both so distressed, especially Robert, who had to personally do most of the work, could not eat or sleep because of the strain. As soon as the DEP would visit it would upset him so much his heartbeat would skyrocket to 160bpm and his doctor told him he was a heart attack waiting to happen. As the actions of the DEP escalated, so did Robert's health issues. The DEP was now saying we were in danger of polluting the roadside ditch. The next time Robert went to the doctor he had to undergo an operation for a pacemaker implant because he was in such bad shape from the aggravation from the DEP, and this further curtailed the amount of work he could do with the manure.

11. Throughout this whole period, the only person who was fair to us and treated us with respect, including lawyers, judges and the DEP, was the Honorable Judge Keith Quigley, whom we went before for a penalty hearing. He understood our problems. In his brief on page 22, 1st par, he states to Mr. Jager *"go and get your health squared away, get your loader fixed and so on and so forth. We come back in at a later date, if necessary."* He did not give us a specific amount of time to get it done so there was no need for the DEP to continue harassing us to do it faster, or to keep adding more things to be done as time went on. Judge Quigley specifically emphasized to attorney Dawn Herb that she should NOT discuss our problems with the bank as it would induce the bank to pull back our loan and accelerate it. However, she ignored his advice and contacted the bank anyway, which was collusion and interference with our contract with the bank, and they did exactly as Judge Quigley said, and that was what brought about the problems we are undergoing today.

THE DEP contends that we never complied with any of their requests (despite the fact we did nothing wrong). We had always planned on removing the manure to the top field to be used for mulch for the field. They asked us to wrap material around the pile to prevent it from going into the ditch at the bottom of the driveway, which they contend would continue on into the Commonwealth and possibly pollute it. We wrapped the material and hammered stakes in the ground to hold the material in place, and dug a channel onto the property to let the water divert into there, rather than going

4

down the driveway. They still harassed us and said it was no good. We are in compliance because according to the DEP's own booklet, *Land Application of Manure*, page 6, it says we have to be 100 ft. away (or less) from the roadside ditch. (*See Attachment 1*) We are over 200 ft. away, so we are well in compliance and therefore not breaking any laws. Judge Ledbetter's Brief reiterated on [see page 15 of Judge Quigley's transcript) *"store it more than 100 feet from the commonwealth waters;"* Well, the manure has ALWAYS been stored over 200 feet from the roadside ditch which is several miles from the Commonwealth waters, so it should never have been a problem.

## A. FALSE ACCUSATIONS, PERJURIOUS ALLEGATIONS & OBSTRUCTION BY THE DEP

### I. *DENIAL OF OUR DUE PROCESS RIGHTS TO AN EVIDENTIARY HEARING:*

Judge Ledbetter held a hearing with the DEP which we were not informed of. We asked for a rehearing but only received a *per curiam* order denying our request for a rehearing which was not signed by a judge. According to Black's Law Dictionary, 6th edition, it defines *per curiam* as "a phrase used by the whole Court from an opinion written by any one judge. Black's Law has no definition for a *per curiam* order, so therefore a *per curiam* order is not legal. According to the Constitution, Article 6, 2nd clause, *"for a contract to be enforceable, it must be executed by all parties to the contract."* Therefore, if orders are not signed, they are unenforceable.

We were never Notified to be in Court, nor was there ever any receipt produced that we ever received notice. We were told by Mr. Michael Tomei the wrong Court date, **IF** we had to go to Court. He had intimated to Robert that they would not bring us to Court; it was unlikely to happen, and we relied on that. Robert requested that **IF** he did have to appear then what would the date be. He was told it would be on the 27th of July. We were in Long Island and decided that, despite the fact we did not receive any Notification that there would be Court, we would not take any chances, because we no longer trusted the DEP, and we would take our good clothes and go to the farm the day before so we would

5

be prepared 'just in case' the DEP pulled a fast one and there would be Court. On the way up Robert called Patricia Havens to find out the exact time of Court the next day and was told that Court had already been held that morning, on the 26th. He was stunned. So Court was held on a different day from what he was told, without one single call, snail mail, email, certified mail, in-person hand-off – nothing! All to prevent our day in Court.

When they wanted to hold us in contempt, we were Notified; we received numerous calls, letters, certified mail, and even in-person delivery to my house in Hicksville LI (700 miles round trip) to let us know we were guilty of something or other. One time I was on the way to the Post Office to pick up their certified mail, when I was confronted by the DEP with a personal delivery. I even showed him the certification note for what I was picking up, which was the same thing that he delivered. My neighbors were upset that someone was lurking outside their house for a long time and were going to call the police, and it was an embarrassment to me to be accosted in the middle of the street and served papers. I thought I was being arrested. I was also told later that the two men were wandering around my property, checking doors and windows. What happened to a person's right to privacy in her own home? I am paranoid now that at any moment someone is going to jump out of the bushes and ambush me. I suppose it was more important to deliver a variety of Notices when it involved our being fined, yet when it involved us fighting for our rights it was not so important to them to Notify us to be in Court to defend ourselves. Besides all of this we have never been fined by the DEP.

## II. *COLLUSION & TORTIOUS INTERFERENCE WITH A CONTRACT*

The DEP engaged in a conspiracy with InFirst Bank and were complicit in trying to cheat us out of our property under the guise of our having committed some kind of crime concerning the manure on the property, which they contended could possibly pollute the Commonwealth. **This was "tortious interference, also known as intentional interference with contractual relations,** in the common law of **torts,** which occurs when one person intentionally damages someone else's **contractual** or business relationships with a third party causing economic harm." 525-26,

6

446 S.W.2d at 546 (*citing* RESTATEMENT OF *TORTS* § 766 cmts. (1939)).

... *contracts* take *precedent* over an interest in unbridled competition. The DEP has interfered with our contract with InFirst bank by going behind our backs and colluding with the bank and not allowing us to have our day in court, thereby denying our due process rights. This was also tortious interference or economic interference which allows damages for intentional or negligent acts that have caused us economic damage. *Della Penna v Toyota Motor Sales, USA* 11 Cal 4th 376,393 (1995). Procedural due process is when a citizen is *denied life, liberty or property interest, the person must be given notice, the opportunity to be heard and a decision by a neutral decision maker.* Tortious interference and economic interference allows recovery of damages for negligent or intentional acts. The DEP has been in touch with the InFirst bank for the past year, probably talking on the phone and emailing back and forth on how they can cause us harm and prevent us from holding on to our property. We should be able to get discovery of the phone calls and emails to see what was said and how frequently they were colluding. The DEP even went to court for the bank which shows that there was a relationship there. We never had a hearing and interference with our contractual or business relationship with the bank caused us economic harm as well as numerous other problems. ***Texaco, Inc. v. Pennzoil,*** *Co.* Brief. Citation, 729 S.W.2d 768 (Court of Appeals of Texas, Houston (1st Dist.), 1987); *Colin Kaepernick settled with the NFL for collusion for $10,000,0000. (See Attachment 2)*

### III. PREJUDICE, EQUAL RIGHTS UNDER THE LAW & SELECTIVE PROSECUTION

The Henry Farm on Piney Road in Curwensville had several of their cows in the river (*See Attachment 3*) with their tails up, polluting the water. We are not polluting anything. Why are they allowed to pollute the water and not have any punishment? This is not equal justice under the law. Just because they have money to fight it and we do not should not prevent us from getting a fair assessment, and prevent selective prosecution.

7

### *IV. ELDER ABUSE*

The DEP has caused us irreparable harm by lying, perjury, fraudulent actions and accusations. I have had two heart attacks and a pacemaker since we have gotten involved with the DEP because they have been relentless in their pursuit of removing us from the farm and now again they are trying to remove us from the farm after the bank had told us they would accept a certain amount of money, which we agreed to. Now the bank is reneging on the deal and wants us out of the farm, which was never part of the deal and is fraud by both the bank and the DEP.

## B. DEFENSES AGAINST THE DEP

### *CLEAN STREAM ACT*

Congress repealed the Clean Streams Act, known as the Waters of the US Rule which removes restrictions enforced by the Obama Administration. Since the DEP has stated, falsely, that we could **possibly** contaminate the waters of the commonwealth, the repeal of the Clean Streams Act will remove that charge against us, despite the fact that we have never polluted the waters of the commonwealth, and we continue to remove the manure from the barn area to the mulch pile up to the level field.

### *RIGHT TO FARM*

The RTFA supports our right to farm, 3PS Par 954, the "Protection of Agricultural Operations from Nuisance Suits and Ordinances." The RTFA is known as the statute of repose *"because it only allows an action to be brought during the first year of operation or the right to sue is lost permanently."* We were here 4 years before any action was taken. The DEP has no right to remove our means of livelihood, especially when at least 60% of the manure was here before we bought the farm. We should not be blamed after

the fact, especially when no one, not the owners, the bank, the DEP, or anyone pointed out that there would be any problem with the DEP.

- **_WE ARE NOT POLLUTING THE COMMONWEALTH_**

The DEP says that we are not in compliance because we are not 100 feet away from the roadside ditch and that the water goes down the driveway and goes into the commonwealth.

a. **We are over 200 feet from the roadside ditch**, so that should eliminate that charge.
b. The water that comes down the driveway when it rains is diverted through a small ditch that is dug into the land at the middle of the driveway.
c. We could not possibly pollute the commonwealth from Pleasant Valley Rd ditch because it **DOES NOT FEED INTO SHILOH**, which is six miles away **AND IS THE START OF MILL STREAM RUN**. These ditches meander around behind people's yards and have no connection **to Mill Stream Run.**

There are plenty of places for the DEP to concentrate on without hounding us all the time. We are doing what we can and can do no more. It would be more helpful if every time we turned around there was NOT another letter, another person, another examination, another Court date that we have to stop and address, which is making our lives a true nightmare. We have no time to concentrate on all the other major problems we already have and I believe that all the DEP problems will be the death of both of us, sooner rather than later. All we want is to retire up here and open our 501c3 to take care of suicidal veterans, without an every-day hassle, complaint or abuse. For thousands of years horse manure has been around and I do not believe that it all needs to be removed immediately in order for people to live a healthy life.

A while ago in Millersburg, about a 1,000 gallons of oil spilled into the Susquehanna river from the Alvord-Polk tool company.

9

On Brunner Island there are over 1200 fish dead from pollutants from Talen Energy.

On October 22, 2016, in Lycoming county, right in the back yard of the DEP, there was a 55,000 gallon gas spill from Sunoco Logistics. It seems that this was not the first time that they had a broken pipe empty into the river, so maybe the DEP should have been watching them instead of two old people who could not possibly pollute as much as they did if they lived another 100 years.

**<u>According to many experts, the amount of horse manure that affects the environment is miniscule compared to the following environmental hazards:</u>**

a) Animals, such as bears, deer, cows, horses, elk, moose, etc. using waterways as their personal bathrooms
b) Industrial agriculture
c) Fertilizers
d) Runoff from roads -- brine, chemicals and pollutants
e) Runoff from manure left by horses and other animals on roadways
f) Acid rain
g) Clearfield town sewage treatment plant (as well as other treatment plants) dumps waste into waterways when rainfall is half an inch or more per hour
h) Waste from manufacturing plants
i) Sewage, waste water
j) Soil erosion, degradation
k) Acid mine drainage
l) Land conversion
m) Habitat loss
n) Cow waste lagoons can leak bacteria and other pollutants and antibiotic residue
o) Excess nutrients from over-fertilization can cause harmful plant growth (algal bloom) which kills fish
p) Nitrogen can degrade ecosystem, making water more acidic, promoting growth of plants (eutrophication) which can make water low in oxygen or hypoic, leaving dead zones where fish cannot survive
q) Pathogens and other microorganisms
r) Fracking is said to have major polluting problems
s) In a *Clearfield County Waters* booklet by the Clearfield County Conservation district, Carl Undercofler of Woodland, has stated that Roaring Run has little aquatic life because of area clay mines. In fact he says at the time he wrote it there were only 3 Bradford township streams with good enough water to support aquatic life. Roaring Run, Valley Fork and Forcey Run are now dead, along with Millstone Run where it starts at Shiloh, which is five miles from Woodland. This is now the most polluted watershed in Clearfield County. **Millstone Run is the creek which the DEP says our roadside ditch is supposed to run into, but it does not start until Shiloh, which is five or six miles from Bradford Township, where our farm is located.** Also in that book, "Emigh Run is presently the victim of the coal industry. Several grants have been

awarded for assessment and cleanup of this stream. This, in turn, will lessen the pollution entering Moshannon Creek."
t)   Drainage from abandoned mines
u)   Many times after a rainfall the Susquehanna in Clearfield town is a sickly color green. Obviously it must be polluted by algae or copper or something that would turn it that color.

All in all, the point is that there are so many other areas that the DEP should be concentrating on that would make a much better dent in clearing up the environmental pollutants, rather than harassing two senior citizens who are doing their utmost to comply with their rules and regulations. If we are within the range of how far we can start a compost shouldn't we then be allowed to do that and leave the manure as is? Is the DEP again changing rules where we can no longer be within a 100-ft radius from a roadside ditch, but now have to move it further? Our health is being affected by the constant complaints and harassment. We are not being treated with equal justice under the law, according to the constitution. Both Robert and I are ill, caused by the endless anxiety we suffer on a daily basis from the DEP problems. We have not recovered from our auto accident and I cannot even drive more than a few miles because I am still traumatized. It seems as if the DEP has taken on a personal vendetta against us and are determined to totally destroy our lives. We demand equal protection under the law. My mother and another daughter also passed away during this period and neither of us have had the time to properly mourn their passing because we have been too busy running on the DEP treadmill. So the burden of even driving up and back falls to Robert, along with the thousand other things he has to do. That, along with his own personal health problems, is being magnified by our dealings with the DEP.

11

## V. <u>SUMMARY</u>

For the past five years our basic quality of life has been non-existent. So far it has cost us over $50,000. to try to comply with the DEP. That, coupled with the money lost from Robert being unable to work, and being unable to rent out stalls and houses has destroyed our lives. We will never get back that time or money that was lost because it is too late for us but we do not want the DEP to be able to do the same thing to anyone else ever again. We put $100,000.00 down on the mortgage from a 401k in 2011 which probably would have at least doubled by now, plus thousands of dollars of payments. The bank has foreclosed on us because of the actions of the DEP and their involvement. We request the court to grant us a judgment against the DEP for $500,000.00 for the loss of our farm and personal finances, emotional stress, and health issues caused by the DEP, and any other compensation which this Honorable Court deems equitable and just.

Respectfully submitted,

1/13/20 _Margaret M. Jager_  _Robert W. Jager_

### <u>CERTIFICATION</u>

We Certify that what we have written above is true to the best of our knowledge and recollection, knowing that if it is not then we are subject to punishment.

1/13/20 _Margaret M. Jager_  _Robert W. Jager_

# Coal Miners Rejoice After Senate Votes to Repeal Stream Protection Rule

By Reuters
February 2, 2017

The battered U.S. coal industry rejoiced after the Senate voted on Thursday to repeal a rule that limited companies from dumping mining waste in streams, saying the move could halt the sector's decline.

The Senate, approving a resolution passed by the House of Representatives on Wednesday, overturned the Stream Protection Rule as part of a broader move by Republicans to reverse what they see as overregulation by former President Barack Obama's administration on energy development.

The demise of the rule had been expected. The Congressional Review Act allows Congress, controlled by Republicans, to undo rules finalized at the end of a previous administration.

"This is one very, very important step to get coal back on its feet and stop the hemorrhaging of jobs that we've seen," said Luke Popovich, a spokesman for the National Mining Association.

The coal industry hopes the move is the first step toward a recovery under President Donald Trump, who has vowed to clear away regulation to support more mining. Coal advocates are hoping his administration will overturn a moratorium the Obama administration placed on new coal leases on federal lands, and scrap regulations on carbon dioxide emissions.

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/nfl-paid-under-10-million-to-settle-colin-kaepernick-grievance-11553192288

SPORTS | NFL

# NFL Paid Under $10 Million to Settle Colin Kaepernick Grievance

The league resolved collusion grievances with the former 49ers quarterback and Eric Reid, who led player protests during the national anthem, last month



San Francisco 49ers safety Eric Reid, left, and quarterback Colin Kaepernick kneel during the national anthem before a game in 2016. PHOTO: MARCIO JOSE SANCHEZ/ASSOCIATED PRESS

*By Andrew Beaton*
March 21, 2019 2:18 p.m. ET

Colin Kaepernick and Eric Reid, the NFL stars who alleged the league's teams colluded to keep them off the field after they led protests during the national anthem, will receive less than $10 million to settle grievances with the league, according to people briefed on the deal.

*Attachment #2*





attachment 3